**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF OHIO**

**EASTERN DIVISON**

| | |
|---|---|
| VINCENT HOWARD, | CASE NO. 1:25-cv-00971-JPC |
| Petitioner, | DISTRICT JUDGE J. PHILIP CALABRESE |
| v. | MAGISTRATE JUDGE REUBEN J. SHEPERD |
| WARDEN JAY FORSHEY, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

## I.      Introduction

On May 9, 2025[1], Petitioner Vincent Howard ("Howard"), a prisoner in state custody,

filed a Petition for a writ of habeas corpus under 28 U.S.C. § 2254. (ECF Doc. 1). Respondent

filed his Return of Writ, along with the state court record and trial transcripts, on October 10,

2025. (ECF Doc. 11 *and attachments*). On December 22, 2025, Howard filed his Traverse. The

matter is therefore fully ripe for review.

## II.      Factual Background

Ohio's Eighth District Court of Appeals summarized the facts of Howard's case as

follows:

> {¶ 3} On August 17, 2020, Howard was charged with eight counts related to the
> alleged sexual assault of C.S. This case was tried to a jury, and on August 19, 2022,
> Howard was found guilty of three counts of forcible rape and one count of GSI. On

---

[1] Federal district courts apply the prison mailbox rule, accepting filings as of the date placed in the prison
mail system. *See Houston v. Lack*, 487 U.S. 266, 270 (1988).

1

September 15, 2022, the court sentenced Howard to an aggregate prison term of 15-17.5 years.

. . .

## II.     Trial Testimony and Evidence

{¶ 5} The state presented three witnesses: nurse Denise Robinson, C.S., and police officer Berri Cramer. Howard testified in his own defense.

### A.     Denise Robinson

{¶ 6} Denise Robinson ("Robinson") testified that she is the forensic program coordinator for University Hospitals and "primarily works with patients who have been victims of sexual assault, domestic violence, or victims of crimes." Robinson is also a SANE nurse, which means she is a certified sexual-assault nurse examiner who performs rape kits on sexual-assault victims. Robinson was working on February 3, 2020, and she treated C.S. as well as filled out C.S.'s sexual-assault forensic report (the "rape-kit report"). The state introduced this rape-kit report into evidence.

{¶ 7} According to Robinson, C.S. was 19 years old at the time Robinson treated her. C.S. named Howard as the person who sexually assaulted her. C.S. described Howard as her "Godfather." Robinson collected swabs from "dried stains" on C.S.'s head, breast, thighs, back, and hands because, according to C.S.'s "story[,] those are the areas that she mentioned that may have been touched. So those are the areas that I would swab." Robinson further testified about direct questions that she asked C.S., such as, "Did the finger touch or penetrate your vaginal, anal, or oral areas?" Robinson testified that C.S. answered "yes to vaginal."

{¶ 8} Robinson testified that, although C.S.'s narrative in the rape-kit report does not "really mention" digital penetration, Robinson "documented what [C.S.] told me in the narrative" by writing the word "yes" on the report in answer to the question, "Did finger touch or penetrate" C.S.'s vagina. To clarify, the prosecutor asked Robinson the following question: "But earlier [C.S.] did say that [Howard's] finger did go in there, but when she told you the whole story the finger wasn't mentioned, correct?" Robinson answered, "Yes, yes."

{¶ 9} Robinson testified that C.S. stated to her as follows during the examination: "He gave me oral. He tried to make me get on top of him when he was giving me oral. My legs were shaking. My heart was beating real fast. He asked why I was shaking." According to Robinson, C.S. was "[s]oft-spoken [and] tearful throughout" the examination, and C.S. told Robinson that she felt sick.

### B.     C.S.

2

{¶ 10} C.S. testified that she has known Howard since she was four years old when he was dating C.S.'s mother. C.S.'s mother passed away when C.S. was seven years old, but Howard remained in C.S.'s life. C.S. referred to Howard as her godfather, testifying that "he stepped up and fulfilled the role of father in my life." C.S. resided primarily with her grandmother, although she spent most weekends while she was growing up with Howard and his children.

{¶ 11} On February 2, 2020, at approximately 6:00 p.m., C.S. arrived to work at an Amazon fulfillment center. C.S. had a taser in her work bag, and when she entered the facility, her taser set off the metal detector. C.S. was sent home from work that evening. C.S. was upset, and she called her grandmother, then called Howard. C.S.'s grandmother and Howard agreed that C.S. needed to be patient, and she would be back at work in a few days. C.S. testified that Howard said to her, "[I]t's the Super Bowl, the game is on, you want to order a pizza and watch the game." C.S. then went to Howard's house in Garfield Heights.

{¶ 12} When C.S. arrived at Howard's house, he was home alone, and he had the television on in his bedroom. C.S. and Howard went into his bedroom to watch the Super Bowl. C.S. sat "[o]n the bed. In the corner toward the wall on the edge of the bed." C.S. testified as follows about what happened next:

> After that he comes into the room and he sits at the head of the bed. And I was talking to him, looking at the game, not really paying attention to what was taking place, just trying to distract myself somewhat. And he said I still looked sad and to come up to the head of the bed so he could hold me. And he haven't held me like that since I was a kid. * * * And he told me with his arms out, as a hug, to come in like a father.

{¶ 13} C.S. went to Howard and laid her head on his chest. Howard called C.S. his "little baby." Howard continued to watch the Super Bowl, and C.S. fell asleep still "laying" on Howard. At some point later, C.S. woke up to Howard "caressing" her arm and leg. C.S.'s testimony continued: "When I woke up, my sports bra and my shirt being lifted and all — the game was off and the lights were off and the door was closed. * * * My shirt was being lifted and my sports bra and I was on my back." According to C.S., Howard's hands were on her breasts. C.S. testified that she "[f]elt like a dead body. Like I felt like I couldn't move. I felt like I got stuck — just felt stuck. I just felt real heavy and stuck. Just like my body was just paralyzed."

{¶ 14} According to C.S., Howard was on top of her. "His hands were on my breasts and he was making his way down towards my pants to pull them down. * * * He was like on his like knees. He was laying down. As I was laying on my back, he was maybe like laying over me. So as he was pulling my shirt up * * * he was making his way down to pull my pants like down my body is what I am trying to tell y'all."

3

{¶ 15} C.S. testified that when she first woke up, Howard's head "was like on my breast. He was playing with my breasts, licking my breasts." Howard took C.S.'s pants and underwear off. C.S. did not tell Howard no, and she did not "try to fight him off." Asked why, C.S. testified as follows:

> I was just preparing myself for what was about to happen because I was feeling around for my phone and my keys, where they was at before I fell asleep. And I couldn't feel them nowhere. So I was just preparing myself for what I knew — I knew what was about to happen, thought was about to happened because the door was closed and my phone and my keys was moved from the side of me and the bedroom door was closed and all the lights was off. And he was on top of me. So I was telling myself like no fighting this because of the size. And I knew I can't make a run for it because the door is closed and I can't call nobody because my phone and stuff was moved from the side of me. So I just was bracing myself for the fact that he going to rape me and then kill me right afterwards. That's all I kept trying to prepare myself for. I just kept telling myself over and over.

{¶ 16} Asked if she cried, C.S. answered, "Yeah. I cried the whole time. I opened my eyes to realize it wasn't a dream."

{¶ 17} C.S. testified that Howard did not say anything until he pulled her pants down. "When he pulled my pants down, he performed oral on me and was pleasuring hisself and that's when he started talking and saying he was so sorry."

Asked if Howard put his mouth on her vagina, C.S. answered, "Yes." C.S.'s testimony continued:

> Q: While he's down there using his mouth on your vagina, where are his hands? What are his hands doing?
> A: Pleasuring hisself. He was masturbating.
> Q: Are either of his hands touching your vagina that you know of? Was anything going inside of your vagina outside of his tongue at that point?
> A: I don't remember. He just performed oral and was pleasuring himself. I don't remember.

{¶ 18} According to C.S, Howard "came back up to the head of the bed and wrapped his arms around" her. Howard again told C.S. that he was sorry, and she was "too pretty for [her] own good." C.S. testified that she was crying "[t]he whole time." C.S. testified about what happened next:

> He kept trying to force his tongue into my mouth, was like kissing me. I just kept my mouth shut, kept my lips shut, was crying. And

4

then he asked me like do you want me to continue. And I still was just crying. I gave him no answer. And he said I'm going to just keep going. He turned me on my — he turned me on my stomach and * * * [s]aid I'm going to just continue.
* * *
So when he turned me on my stomach that's when he — put his thing inside of me. * * * I was on my stomach and he put his penis inside of my vagina.

{¶ 19} Asked how long this lasted, C.S. answered, "It seemed like forever. I don't know how long it lasted." Asked if Howard ejaculated, C.S. testified that she did not know. Asked how she knew that it was Howard's penis that penetrated her vagina, C.S. answered, "Because he was moving his hands to be able to put it in." Howard asked C.S. if she "liked it," and C.S. said "no" while she was crying into the pillow. At that time, Howard "got off of" C.S., who "ran to the corner of the room" looking for her pants, phone, and keys. Howard told her to "close [her] eyes so he could turn the light on." Howard then handed C.S. her keys and phone.

{¶ 20} C.S. got dressed and started to walk out of the door. Howard told C.S. that she forgot her shoes. C.S. grabbed her shoes and left the house. C.S. recalled that Howard "was just standing there" dressed in a "wife beater" and boxer shorts. C.S. testified that her "body just felt heavy" and she "walked like a zombie to the car." C.S. also recalled that, although her truck was still parked in Howard's driveway, it was "turned around" and was facing the opposite direction "from where [she] had parked it at." According to C.S., "somebody" moved her truck. C.S. got in her truck and went to her grandmother's house. Along the way, C.S. stopped at a light on Miles Road to throw up. C.S. told her grandmother what happened, and her grandmother took her to the hospital.

{¶ 21} According to C.S., the police came to the hospital to talk to her that day, and she met with a detective about a week later at her grandmother's house. At the detective's directive, C.S. called Howard on February 10, 2020, and this call was recorded. C.S. testified that she and the detective did not discuss what C.S. "would say on that call" before C.S. made the call. According to C.S., her conversation with Howard was "authentic."

{¶ 22} A recording of this phone call was introduced into evidence and played for the jury. The following is relevant to the instant appeal.

{¶ 23} Howard asked C.S. where she was. C.S., who was audibly sobbing during this phone conversation, responded. Howard then said to C.S., "I am so sorry." Howard asked C.S. to come over and talk about what happened. C.S. said, "I'm not coming over." C.S. told Howard that she "need[ed] to understand" what occurred that night. Howard said, "I, I, I, I, got confused and thought you were somebody different. I thought you were this girl with a 'black and mild' smell * * * that I was dating, Shonniece." Howard further stated, "I, I, I that's no excuse. I don't know

why that was in my head or anything. * * * I would never, I should never. I don't even know what to say or do. I should never have done that to you."

{¶ 24} C.S. stated to Howard, "You really raped me. * * * I can't sleep." Howard said nothing. C.S. explained in excruciating detail the effect that Howard's actions had on her, including wetting the bed and throwing up in her sleep. Howard said, "You know I would never * * * want to hurt you. I don't have anything I can do to explain or excuse myself."

{¶ 25} After the audio recording was played, the prosecutor asked C.S. if she consented "to any of this." C.S. answered, "No." The prosecutor then asked C.S. the following question: "Had another man done this to you, who would you have called?" C.S. answered, "Vince. I would have called Vincent Howard if another man would have done this to me."

C.      Berri Cramer

{¶ 26} Berri Cramer ("Off. Cramer") testified that she is a patrol officer with the Garfield Heights Police Department. On February 3, 2020, Off. Cramer met with C.S. at Ahuja Medical Center "for a possible rape report." After speaking with C.S., Off. Cramer learned that Howard was the suspect of C.S.'s allegations.

D.      Howard

{¶ 27} Howard testified that he met C.S. in 2005 when he began dating C.S.'s mother. At the time, C.S. was four years old. Asked what his relationship with C.S. was, Howard testified that it "[w]as sort of a friendship, kinship to a fatherly role." C.S.'s mother passed away in 2007 when C.S. was six years old. C.S. was raised by her maternal grandparents, but Howard and his children maintained their relationship with C.S.

{¶ 28} On February 2, 2020, Howard was "home in bed, sick * * *. Fever, headache." According to Howard, he had plans to watch the Super Bowl that night with his son, but Howard was "too sick to go into the living room and hang out with him," so Howard's son went out. Howard drank "a cup and a half" of a Jack Daniel's "hot toddy." In the early evening, C.S. called Howard with "a problem at work where they wouldn't let her go in because of [a] stun gun, so she was upset that she couldn't work." Howard told C.S. that he "could just order her some pizza" and they "could talk about it, like [they] always have."

{¶ 29} C.S. arrived at Howard's house approximately 30 minutes later. Shortly after C.S. arrived, the pizza was delivered. Howard "grabbed a couple slices and headed towards the bedroom." C.S. also got pizza and took it into Howard's bedroom. According to Howard, he got into bed after he finished eating his pizza. The television and the light were on, and the bedroom door was open. Howard testified

that he fell asleep watching the Super Bowl. Howard testified as follows about what happened next:

> Yeah, so I was in bed asleep and I find somebody crawl in bed and lay three quarters across my chest and legs. * * * Felt the tugging and caressing of my beard and kissing. * * * And then I began to start to kiss back. * * * Then * * * my hand was on the back from the left side, start caressing, start rubbing, working my way down.

{¶ 30} According to Howard, C.S. "initiated" the kissing. Howard testified that C.S. has "never laid in the bed with me." Howard also testified that when he woke up to C.S. kissing him, the television and light were off. Howard explained that the television will go into "dark mode" after a period of nonuse, but he did not turn the bedroom light off. Howard did not recall whether the bedroom door was open or closed.

{¶ 31} Howard testified that C.S. "had her thighs, leg sliding right against my private areas." Asked if "at that time could you tell that it was" C.S., Howard answered as follows: "Yeah, shortly after that, I knew it wasn't Shonniece." After realizing the woman in bed with him was C.S., Howard "started to get aroused [and] just started returning the affection."

Asked if C.S. ever told Howard to stop "or any of those words to that effect," Howard answered, "No." Howard testified that he did not restrain or threaten C.S. According to Howard, he touched and kissed C.S.'s breasts and "went down to give oral" to C.S. Howard testified that C.S. was not crying when this encounter occurred. Rather, Howard stated that C.S. was "moaning."

{¶ 32} Howard testified that no other sexual activity between him and C.S. occurred. Specifically, Howard denied penetrating C.S.'s vagina with his penis, stating that he suffers from erectile dysfunction. Howard did not testify about whether or not he digitally penetrated C.S.'s vagina.

{¶ 33} Howard testified that C.S. left his house that night, and he denied moving C.S.'s car. Howard stated as follows regarding the phone call between him and C.S. that was played for the jury:

> We had sex, but it should have never happened between us. I had always looked at her as a daughter, treated her as a daughter. We had sex and I just could not wrap my head around it. I could not stop beating myself up mentally over it. I mean, to the point where I'm sleeping an hour, two hours at a time in the middle of the night then shaking to wake up just looking around. * * * And then to hear her cry destroys me. It always has.

7

{¶ 34} On cross-examination, the state asked Howard the following question after Howard testified that his penis did not penetrate C.S.'s vagina: "Why do we find your DNA inside [C.S.'s] vagina * * *? [E]xplain why your semen is in her vagina." Howard responded that "if I had any kind of leakage, anything on my shorts, or she got on top where the opening is in my boxer brief, yeah, there's my penis right there." According to Howard, "[t]here was no crying when [he and C.S.] had sex," and C.S. was "lying about that."

(ECF Doc. 11-2, pp. 143-54; *see also State v. Howard* ("*Howard I*"), 2023 WL 7041674, at *1-5 (Ohio Ct. App., Oct. 26, 2023).

III.  **Procedural History**

A.  **State Conviction**

On August 17, 2020, a Cuyahoga County grand jury returned an eight-count indictment charging Howard with three counts of rape under O.R.C. § 2907.02(A)(2), first-degree felonies; (Counts One, Three, and Five). (ECF Doc. 11-2, pp. 6-8). Count One was for engaging in cunnilingus; Count Three, for digital penetration; and Count Five, for vaginal penetration. (*Id.*). The grand jury also indicted him on three counts of rape under O.R.C. 2907.02(A)(1)(c), also first-degree felonies (Counts Two, Four, and Six). (*Id.* at pp. 7-9). Count Two was for engaging in cunnilingus where the victim's ability to resist or consent was substantially impaired; Count Four, for digital penetration; and Count Six, for vaginal penetration. (*Id.*). The grand jury also indicted him on two counts of gross sexual imposition (GSI) under O.R.C. 2907.05(A)(1) and (A)(5) (Counts Seven and Eight) for touching and kissing the victim's breasts by force and while the victim was asleep on or about February 3, 2020. (*Id.* at p. 9).

On May 6, 2022, Howard's counsel moved for a continuance of the June 3, 2022 trial date, in part due to permit additional factfinding by a private investigator. (*Id.* at pp. 14-15). Counsel renewed the motion for a continuance on June 3, 2022. (*Id.* at pp. 24-29). The state trial court judge continued the pretrial conference from June 2 to June 8, 2022 to permit ongoing

8

discovery, but kept the trial date set for June 13, 2022. (*Id.* at p. 17). On June 8, 2022, the trial was continued to August 15, 2022 at defendant's request. (*Id.* at p. 314). Howard's counsel again moved on August 12, 2022 for a continuance of the August 15, 2022 trial date in order to obtain and review information discovered by a private investigator. (*Id.* at pp. 19-22). This request was denied and a jury trial was held August 15-18, 2022. (*Id.* at p. 314).

During a jury trial held on August 18, 2022, the State dismissed Counts Two, Four, and Six; the court denied a Rule 29 motion of acquittal; and the jury was instructed and deliberated. (*Id.* at p. 31). The jury found Howard guilty of rape under O.R.C. 2907.02(A)(2) on Counts One, Three, and Five; guilty of GSI under O.R.C. 2907.05(A)(1) on Count Seven; and not guilty of GSI under R.C. 2907.05(A)(5) on Count Eight; Counts Two, Four, and Six were nolled. (*Id.* at p. 33).

On September 15, 2022, the court imposed five years each on Counts One, Three, and Five, to run consecutively for a total of 15 years; and 18 months on Count Seven, concurrent, for an aggregate term of 15 to 17.5 years. (*Id.* at p. 33). In addition, the court advised Howard that each of Counts One, Three, and Five were subject to Reagan Tokes Law, meaning that each count had an indefinite sentence, with minimum sentences of 3 to 4.5 years and maximum sentences of 11 to 16.5 years. (*Id.*). Howard was also subject to a mandatory five years of post-release control. (*Id.* at p. 34). The court informed Howard of his obligations as a Tier III sex offender, with Tier I registration also noted in the entry. (*Id.* at pp. 33-35).

A *nunc pro tunc* entry of September 27, 2022 corrected the sentencing entry to reflect a total prison term of 15 to 17.5 years under S.B. 201 (Reagan Tokes Law). (*Id.* at pp. 37-39). A September 27, 2022 *nunc pro tunc* entry corrected the sentencing entry to reflect Count Three instead of Count Two; a December 7, 2022 *nunc pro tunc* entry corrected the total prison term as

in the September 27 entry, and typographical errors; and a December 22, 2022, *nunc pro tunc* entry again corrected the count references to reflect Count Three instead of Count Two. (*Id.* at pp. 41-43; 215-17; 219-21).

## B.      Direct Appeal

On October 7, 2022, Howard filed his notice of appeal. (*Id.* at pp. 45-57). He filed his appellant's brief on February 8, 2023. (*Id.* at pp. 59-103). In it, Howard presented three assignments of error:

> Assignment Of Error No. 1 - Appellant's Trial Court Abused its Discretion by Denying Defense Motions for a Continuance of the Trial, Thereby Denying Appellant a Meaningful Opportunity to Present a Complete Defense Which Denied Him Effective Assistance of Counsel in Violation of His Rights Under the Due Process Clauses of the Fifth, Sixth and Fourteenth Amendments to The United States Constitution and Sections 10 and 16, Article I, of The Ohio Constitution
>
> Assignment Of Error No. 2 - Appellant's was Deprived of His Constitutional Rights to Due Process in Violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution, as a Consequence of the State's Prosecutorial Misconduct
>
> Assignment Of Error No. 3 – Appellant Convictions Were Not Supported by Sufficient Evidence and Were Against the Manifest Weight of the Evidence in Violation of His Rights Under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

(*Id.* at p. 61). The State filed its appellee's brief on March 20, 2023. (*Id.* at pp. 105-125). Howard filed a reply brief on March 24, 2023. (*Id.* at pp. 127-42). On October 26, 2023, the Eighth District Court of Appeals affirmed Howard's conviction and sentence. (*Id.* at pp. 143-73; *see also Howard I*, 2023 WL 7041674, (Ohio Ct. App., Oct. 26, 2023)).

Howard then filed a notice of appeal to the Ohio Supreme Court on December 11, 2023. (ECF Doc. 11-2, pp. 175-97). In his memorandum in support of jurisdiction, Howard presented the following three propositions of law:

10

First Proposition of Law – Prosecutorial Misconduct Which Damages the Credibility of a Defendant, Denies the Defendant a Fair and Impartial Trial and Violates His Constitutional Rights to Due Process and Equal Protection, in Cases Where the Only Evidence of an Offense is the Testimony of the Accuser, and a Court of Review May Not Conclude, in View of the Prosecu[t]orial Misconduct, That the Accuser's testimony is Sufficient to Satisfy Element of the Offense.

Second Proposition of Law – A Trial Court Abuses its Discretion and Denies a Defendant a Meaningful Opportunity to Present a Complete Defense in Violation of His Sixth Amendment Rights, When it Rejects a Defendant's Reasonable Request for a Trial Continuance Necessary to Permit the Defendant to Obtain Evidence Essential to His Defense

Third Proposition of Law – Mere Disparities Between the Accused's and the Accuser's Physical Sizes, and Conduct Normally and Naturally Taking Place During Sexual Encounters, is Insufficient to Satisfy the Element of "Force," as Required Under Ohio's Rape and Gross Sexual Imposition Statutes.

(*Id.* at p. 179). The State opposed. (*Id.* at pp. 199-211). On February 20, 2024, the Ohio

Supreme Court declined jurisdiction. (*Id.* at p. 213; *see also State v. Howard ("Howard*

*II")*, 227 N.E.3d 1267 (Ohio 2024) (Table).

### C.    Post Conviction Proceedings

On December 8, 2023, Howard filed with the state trial court a petition to vacate or set

aside judgment under O.R.C. 2953.21. (ECF Doc. 11-2, pp. 242-71). In it, he asserted two

grounds:

Claim Number One: Ineffective assistance of trial counsel in failing to obtain and present medical records establishing that petitioner suffered erectile dysfunction disorder; and

Claim Number Two: Petitioner was denied due process of law when the trial court refused to grant a continuance of trial to allow the defense to obtain necessary medical records establishing petitioner suffered from erectile dysfunction disorder.

(*Id.* at p. 243). On December 12, 2023, the State filed a combined response and motion for

summary judgment, arguing the petition was barred by res judicata and law-of-the-case because

the state appellate court had considered and rejected Howard's claims regarding continuance and

11

ineffective assistance tied to the erectile dysfunction issue . Thus, no substantive grounds warranted a hearing. (*Id.* at pp. 274-83, 285-94). The same day, Howard filed a reply brief to clarify and distinguish that his first assignment of error concluded that the trial court's denial of a continuance request caused him to receive ineffective assistance of trial counsel. (*Id.* at p. 299). As of this writing, the state trial court has not ruled on the motion. (*See id.* at p. 301; *see also* Cuyahoga County Clerk of Courts, Case Search CR-20-652446-A, https://cpdocket.cp.cuyahogacounty.gov/CR_CaseInformation_Docket.aspx?q=YRjVWoLON9 WojV9o-3tQ_MxvZMNlYu89lyO5yQtVDxM1 (last visited July 7, 2026)).

## IV.     Federal Habeas Corpus Petition

Howard brings two grounds for relief for this Court's review:

GROUND ONE: Howard was denied a fair and impartial trial, in violation of his due process rights, as a consequence of prosecutorial misconduct, and the state court's rejection of his prosecutorial misconduct claim was contrary to or an objectively unreasonable application of clearly established federal precedent.

GROUND TWO: Howard was denied a meaningful opportunity to present a complete defense and denied effective assistance counsel, in violation of his due process rights, when the trial court unreasonably refused to grant a trial continuance to provide Howard with additional time to obtain medical records essential to his defense, and the state court's rejection of this claim was contrary to or an objectively unreasonable application of clearly established federal precedent.

(ECF Doc. 1, pp. 18, 23).

## V.      Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104-132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), apply to Howard's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). "As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). This is so because "[s]tate courts are adequate forums for the vindication of federal rights" and

12

AEDPA thus acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). As such, AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotation omitted).

Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Cullen*, 563 U.S. at 181, quoting 28 U.S.C. §§ 2254(a), (b), (c). Further, if an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application

> shall not be granted . . . unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007). The burden of proof rests with the petitioner. *Cullen*, 563 U.S. at 181.

First, clearly established federal law for purposes of AEDPA review includes "the holdings, as opposed to dicta, of [U.S. Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to U.S. Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Court on a question of law or if the state court decides a case differently than the Court despite both cases having materially

13

indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005), *cert. denied*, 549 U.S. 1047 (2006). However, a state court does not act contrary to clearly established federal law where U.S. Supreme Court precedent is ambiguous or otherwise unavailable. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court decision is an unreasonable application of Supreme Court precedent where the state court's adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; see also *Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). Under § 2254(d)(2), a state court's factual determination will stand unless it is objectively unreasonable in light of the evidence presented in state court. *Harrington v. Richter*, 562 U.S. 86, 100 (2011). "[A] federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 365.

Next, "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1). And, as the U.S. Supreme Court has repeated, "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion . . . ." *Burt*, 571 U.S. at 18. Federal courts must also defer to a state court's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982).

In all, federal habeas corpus relief is a "guard against extreme malfunctions in the state criminal justice systems," and is different in kind from the relief available in direct appeal.

14

*Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133 (2022) (internal quotation omitted). Thus, to obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing de novo questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007) ("When the state court has not assessed the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").

## VI.  Procedural Barriers to Federal Habeas Corpus Review

Before coming to federal court, a state habeas petitioner must overcome certain procedural barriers, including exhaustion of state remedies and procedural default. *See Daniels v. United States*, 532 U.S. 374, 381 (2001). A federal court sitting in habeas review may review claims that were evaluated on the merits by the state court. But claims that were not evaluated by a state court, either because they were never fully presented to the state court (*i.e.*, state court remedies were unexhausted) or because they were not properly presented to the state court (*i.e.*, they are procedurally defaulted) are not available for federal habeas corpus review. *Bonnell v. Mitchel*, 301 F. Supp. 2d 698, 722 (N.D. Ohio 2004), *aff'd sub nom. Bonnell v. Mitchell*, 212 F. App'x 517 (6th Cir. 2007).

### A.  Exhaustion

A petitioner must first give the state courts a "*fair*" opportunity to act on his claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (emphasis in original). For a claim to have

15

been fairly presented, the factual and legal basis of the claim asserted by the petitioner must have been raised at each and every stage of state review. *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). It is not enough for the claim raised in state court to be "somewhat similar" to the one raised in the habeas petition or implicate the same facts; the state court must have been called upon to apply the legal principles of the claim now presented to the federal courts. *Jalowiec v. Bradshaw*, 657 F.3d 293, 304 (6th Cir. 2011).

The petitioner also must have presented their "claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law." *Williams*, 460 F.3d at 807 (quotation marks omitted). In this Circuit, this can be done in one of four ways:

(1) reliance upon federal cases employing constitutional analysis;

(2) reliance upon state cases employing federal constitutional analysis;

(3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or

(4) alleging facts well within the mainstream of constitutional law.

*McMeans*, 228 F.3d at 681 (paragraph breaks added).

Failure to exhaust occurs where state court remedies are still "available at the time of the federal petition." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). This failure to exhaust can also lead to a petitioner procedurally defaulting his claims. If the petitioner has not fully used his state remedies and has no legal mechanism to do so now, the claim he failed to present is procedurally defaulted, and this Court cannot act on the claim either. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Williams v. Anderson*, 460 F.3d 789, 809 (6th Cir. 2006).

16

### B.    Procedural Default

The procedural default doctrine limits federal review if the petitioner has failed to follow the state's procedural requirements for presenting his or her claim in state court. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). This doctrine flows from the insight that courts must have the authority to insist that "defendants present their arguments on time and according to established procedures." *Benton v. Brewer*, 942 F.3d 305, 307 (6th Cir. 2019). Thus, a federal habeas court will not consider a habeas petition if "the last state-court judgment denying relief on the claim rests on a procedural state-law ground that is 'independent of the federal question and is adequate to support the judgement.'" *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (quotation marks omitted).

This Circuit consults a four-part test to determine whether a petitioner has procedurally defaulted a claim. A petitioner procedurally defaults a claim if: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Because the procedural-default bar to federal habeas review is harsh, courts have created safety-valves to permit review in limited circumstances. A petitioner can obtain review of procedurally defaulted claims if he or she shows: (1) "cause," *i.e.*, that some external factor kept him from complying with the state rule or fairly presenting his claim; and (2) "prejudice," *i.e.*, that, assuming the petitioner's constitutional claim has merit, there is a reasonable probability that a different verdict would have resulted if the alleged constitutional violation hadn't occurred. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wogenstahl v. Mitchell*, 668 F.3d 307, 337

17

(6th Cir. 2012). A petitioner can also obtain review of a procedurally defaulted claim if the procedurally defaulted claim is based on new evidence that the petitioner was factually innocent of the crime of conviction. *See Coleman*, 501 U.S. at 750 ("fundamental miscarriage of justice" exception to procedural default); *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (A "fundamental miscarriage of justice" can occur only when the procedurally defaulted claim would establish that the petitioner was "actually innocent."). But "[A]ctual[] innocen[ce]" means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To overcome procedural default, an actual innocence claim must be supported by "new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

## VII.    Discussion

Howard brings two grounds for relief for this Court's review:

GROUND ONE: Howard was denied a fair and impartial trial, in violation of his due process rights, as a consequence of prosecutorial misconduct, and the state court's rejection of his prosecutorial misconduct claim was contrary to or an objectively unreasonable application of clearly established federal precedent.

GROUND TWO: Howard was denied a meaningful opportunity to present a complete defense and denied effective assistance counsel, in violation of his due process rights, when the trial court unreasonably refused to grant a trial continuance to provide Howard with additional time to obtain medical records essential to his defense, and the state court's rejection of this claim was contrary to or an objectively unreasonable application of clearly established federal precedent.

(ECF Doc. 1, pp. 18, 23).

As to Ground One, Respondent argues it is meritless under the AEDPA because the state appellate court properly applied federal law and found that the prosecutor's comments, while improper, did not affect the outcome of Howard's trial. (*Id.* at pp. 27-35). Respondent argues that the Ohio appellate court is entitled to deference in its determination that the sufficiency of the evidence and its manifest weight supported Howard's conviction. (*Id.*). Respondent argues that

18

Ground Two is not cognizable in federal habeas corpus because it challenges the trial court's

discretion but does not demonstrate that the state trial court's exercise of discretion rose to the

level of a constitutional violation. (ECF Doc. 11-1, pp. 22-27). Respondent further responds that

Ground Two is also meritless under the AEDPA because Howard was allowed during trial to

testify without contradiction about his alleged erectile dysfunction; therefore, any denial of a

continuance to gather this evidence did not deprive him from the opportunity to present this

defense, did not result in a denial of due process, nor did it render his counsel's assistance

ineffective. (*Id.* at pp. 35-42).

Notwithstanding the above arguments, I determine that Howard has presented a mixed

petition and comity principles direct this Court to dismiss Howard's petition sua sponte, so that

he may first exhaust his state court remedies.

In Ground Two, Howard provides:

> GROUND TWO: Howard was denied a meaningful opportunity to present a
> complete defense and denied effective assistance counsel, in violation of his due
> process rights, when the trial court unreasonably refused to grant a trial continuance
> to provide Howard with additional time to obtain medical records essential to his
> defense, and the state court's rejection of this claim was contrary to or an objectively
> unreasonable application of clearly established federal precedent.

(ECF Doc. 1, p. 23). In his direct appeal, Howard asserted the following assignment of error:

> The Trial Court Abused its Discretion by Denying Defense Motions for a
> Continuance of the Trial, Thereby Denying Appellant a Meaningful Opportunity to
> Present a Complete Defense Which Denied Him Effective Assistance of Counsel
> in Violation of His Rights Under the Due Process Clauses of the Fifth, Sixth and
> Fourteenth Amendments to The United States Constitution and Sections 10 and 16,
> Article I, of The Ohio Constitution.

(ECF Doc. 11-2, p. 64). Howard also appealed this ground to the Ohio Supreme Court. (*See id.* at

p. 179). On this basis alone, Howard has properly exhausted Ground Two and it is available for

this Court's review. However, my inquiry does not begin and end here.

In his Petition to Vacate or Set Aside Judgment of Conviction or Sentence, Howard brought the following two claims:

> CLAIM NUMBER ONE: Ineffective assistance of trial counsel in failing to obtain and present medical records establishing that petitioner suffered from erectile dysfunction disorder.

> CLAIM NUMBER TWO: Petitioner was denied due process of law when the trial court refused to grant a continuance of trial to allow the defense to obtain necessary medical records establishing petitioner suffered from erectile dysfunction disorder.

(*Id.* at p. 243). Although Howard filed his petition on December 8, 2023 (*id.* at p. 245), his petition remains pending (*See* Cuyahoga County Clerk of Courts, Case Search CR-20-652446-A, https://cpdocket.cp.cuyahogacounty.gov/CR_CaseInformation_Docket.aspx?q=YRjVWoLON9 WojV9o-3tQ_MxvZMNlYu89lyO5yQtVDxM1 (last visited July 7, 2026)). Without a decision from any state court, these claims remain unexhausted. *See* 28 U.S.C. § 2254(b)(1)(A).

A federal court may not grant the writ unless the petitioner has first exhausted all available remedies in state court. *Id.* And, to be properly exhausted, the factual and legal basis of each claim must have been "fairly presented" at each and every available stage of state court review. *Wagner*, 581 F.3d at 418; *O'Sullivan*, 526 U.S. at 844; *McMeans*, 228 F.3d at 681. Fair presentation means that the state court must have been called upon to apply the same legal principles of the claim to the same facts, as are presented to the federal courts. *See Jalowiec*, 657 F.3d at 304.

The exhaustion and fair presentation requirements are in place so that state courts have the first opportunity to address and correct any violations of the petitioner's constitutional rights. *See Rhines v. Weber*, 544 U.S. 269, 273-74 (2005) (citing *Rose v. Lundy*, 455 U.S. 509 (1982)). Therefore, while not jurisdictional, exhaustion "is a threshold question that must be resolved before we reach the merits of any claim." *Wagner*, 581 F.3d at 415. And because a federal court

may not grant the writ on a mixed petition, "each claim must be reviewed for exhaustion before any claim may be reviewed on the merits." *Id.*

Here, Ground Two, even though exhausted in Howard's direct appeal, also appears to be an amalgam of Claims One and Two in his pending state petition. (*Compare* ECF Doc. 1, p. 23 *with* ECF Doc. 11-2, pp. 64, 243). Therefore, the factual basis and the constitutional questions before the state court directly implicate Howard's petition here.[2]

The interests of comity and federalism counsel that the state court must first have the opportunity to decide Howard's claims before this Court considers his habeas corpus petition. *Rhines*, 544 U.S. at 273. Comity "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter." *Id.* at 274 (quoting *Rose*, 455 U.S. at 518). It would be improper for this Court to step in at this stage and decide Howard's petition while substantially similar claims are yet pending in state court. *See id.* Because the opportunity to decide his claims still rests with the state, Howard must return there before seeking relief with this Court. *See id.*

When presented with a mixed petition such as this, federal district courts have four options:

(1)     dismiss the whole mixed petition,

(2)     stay the case while the petitioner exhausts the unexhausted claims in state court,

(3)     permit the petitioner to dismiss the unexhausted claims and then address with the exhausted claims, or

---

[2] Howard also states that Ground Two, "[a]lthough based on a different constitutional violation, [his] second Ground for habeas relief is intertwined with his first." (ECF Doc. 1, p. 23, ¶40). Because I found this report and recommended decision in principles of comity and federalism and recommend dismissing the petition in its entirety, I make no finding as to whether Ground One is "intertwined" with Ground Two. Regardless of the interrelation of the two Grounds, it remains that the state court has been presented with an opportunity to decide Howard's claims, and that petition must be seen to completion before this Court steps in.

(4)      ignore the exhaustion requirement altogether and deny the petition on the merits if all the claims lack merit.

*Harris*, 553 F.3d at 1031-32 (internal citations omitted). Here, Howard acknowledges that Ground Two may be unexhausted, but neither directly states that he wishes to dismiss the unexhausted claim, nor does he request that this case be stayed while he exhausts his claims in state court. (*See* ECF Doc. 1, pp. 17-18). Instead, Howard states that he has fully exhausted his two Grounds, and that the postconviction petition does not address Ground One and "is only tangentially related to Ground Two." (*Id.* at p. 18, ¶¶ 9, 10). On this basis, Howard filed the present petition, mistakenly believing that his statute of limitations under AEDPA was running and would soon expire. (*Id.*).

But I disagree that the clock on Howard's one-year statute of limitations is running. The AEDPA statute of limitations is tolled for "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). Here, Howard filed his postconviction petition on December 8, 2023, (ECF Doc. 11-2 at p. 245), before the Ohio Supreme Court declined jurisdiction on his direct appeal on February 20, 2024 (*Id.* at p. 213). As a result, Howard's pending postconviction petition has tolled the AEDPA statute of limitations from its start, and his one-year clock has not yet begun to run.

Because his statute of limitations clock has not yet begun to run, Howard would not be barred from bringing his federal habeas corpus petition once the state court decides his postconviction petition. This likewise counsels against staying the present petition, as Howard must still present any remaining claims to each and every level of state court review, even after the state trial court decides the currently-pending motion.

22

Howard has not asked this Court to stay his petition, nor has he requested to proceed on only his exhausted claims; and, because the state court must have the first opportunity to correct any constitutional violations and because Howard will not be prejudiced, dismissal appears to be the most appropriate course. For these reasons, I find that Howard has presented a mixed petition, and recommend the District Court dismiss Howard's petition without prejudice so that he may return to state court and exhaust all claims.

## VIII.  Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1)(A), this Court will grant a certificate of appealability ("COA") for an issue raised in a § 2254 habeas petition only if the petitioner has made a substantial showing of the denial of a federal constitutional right. *Cunningham v. Shoop*, 817 F. App'x 223, 224 (6th Cir. 2020). A petitioner satisfies this standard by demonstrating that reasonable jurists "could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (internal quotation marks omitted); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a claim is denied on procedural grounds, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

However, I make no recommendation as to a certificate of appealability. In this Report and Recommended Decision, I declined to reach the merits of Howard's petition and recommended dismissal without prejudice for him to exhaust his still-available postconviction remedies in state court. Once those remedies are exhausted, Howard may refile his federal

habeas corpus petition so this Court may consider any constitutional claims not corrected by the state's review process. Therefore, should the District Court agree with this recommendation, it would not resolve Howard's constitutional claims, making a recommendation of a certificate of appealability inapplicable in these circumstances.

## IX.   Recommendation

For the foregoing reasons, I find that Howard has not exhausted his state court remedies and has presented this Court with a mixed petition. I therefore recommend that principles of comity direct this Court dismiss his petition without prejudice so that the state first has the opportunity to pass upon the matter before this Court decides his petition.

Dated: July 7, 2026

REUBEN J. SHEPERD
UNITED STATES MAGISTRATE JUDGE

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus

on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).